## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATRICIA R. REAL-LOOMIS** | : | |
| **335 Virginia Avenue** | : | |
| **Havertown, PA 19083** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| | : | |
| **v.** | : | **JURY TRIAL** |
| | : | |
| **THE BRYN MAWR TRUST COMPANY** | : | **DEMANDED** |
| **801 Lancaster Avenue** | : | |
| **Bryn Mawr, PA 19010** | : | **COMPLAINT** |
| **Defendant** | : | |

## COMPLAINT

**COMES NOW, PATRICIA R. REAL-LOOMIS, by her undersigned counsel, who avers as follows:**

### Overview

1.      This is a multi- count complaint alleging The Bryn Mawr Trust Company's ("BMT") violation of applicable civil rights laws, as well as whistleblower provisions of pertinent federal statutes, culminating in the employment termination of Plaintiff Patricia R. Real-Loomis ("Plaintiff" or "Real-Loomis"), a Caucasian female born on March 16, 1958. Plaintiff has been retaliated and discriminated against on account of her sex and age. In addition, she was unfairly targeted, penalized, retaliated against, and finally fired as a result of protesting BMT's insatiable pressure for sales of bank products which were hardly in customers' best interests and led to outright fraud. The actions by BMT appeared to replicate practices utilized by Wells Fargo which resulted in record fines and unprecedented sanctions. Plaintiff perceived and reported BMT practices she felt were improper and fraudulent.

1

2.      Plaintiff has been subjected to a hostile and illegal working environment which pervades Bryn Mawr Trust Company, not only with respect to improper sales practices, but also with respect to the treatment of females and those in the protected age category, all of which is countenanced and supported by top management.  In contrast to males and younger employees with less experience, she was relegated to being an hourly employee throughout her long-term employment until she was fired on February 13, 2019.  After her firing, she dual filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") No. 530-2019-03263 and the Pennsylvania Human Relations Commission ("PaHRC").

3.      As a result of what she perceived as fraudulent and illegal practices which she protested, in early May, 2019, Plaintiff filed a whistleblower complaint with the US Department of Labor- OSHA, #3-6540-19-055 pursuant to the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1514A ("SOX").  Section 806 thereof  protects employees who report fraudulent activity that can harm investors in publicly traded companies. BMT is a wholly-owned subsidiary of publicly traded Bryn Mawr Bank Corporation. The goal of SOX, with respect to publicly traded institutions, is the improvement of the quality and transparency of corporate financial disclosure. The means for accomplishing this is the requirement of certification by top officials such as CEO Leto and the imposition of personal accountability and liability.  Plaintiff's whistleblower complaint also invoked provisions of the Consumer Financial Protection Act, 12 U.S.C. Section 5567, protecting employees who report reasonably perceived wrongdoing by employers, such as BMT, which provide consumer financial products.

4.      With respect to invoking applicable civil rights laws, Plaintiff now seeks to recover compensatory and punitive damages pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, The Age Discrimination in Employment Act of 1967 and the Pennsylvania

2

Human Relations Act ("PHRA"), 43 P.S. §951 *et seq,* in addition to seeking to recover damages under the Equal Pay Act of 1963, as amended, (Pub. L. 88-38).    Plaintiff has been a victim of retaliation in the terms and conditions of her work, barring her from career advancement at Bryn Mawr Trust and who was ultimately fired for her standing up for her rights and the rights of others.

5.    With respect to invoking the above-quoted whistleblower provisions of Sarbanes Oxley and the Consumer Financial Protection Act, Plaintiff now seeks to recover any and all available damages thereunder and otherwise available including front pay in lieu of reinstatement, back pay, raises, bonuses, benefits, overtime, reinstatement of seniority and tenure, retirement benefits, and any other items necessary to make Plaintiff whole.

## PARTIES

6.    Plaintiff Patricia R. Real-Loomis is an adult female born on March 16, 1958. She resides at 335 Virginia Ave., Havertown, PA 19083.   She was initially hired in May of 1999 by BMT as a Financial Services Specialist and was fired some twenty years later on February 13, 2019. At the time of her firing, Plaintiff was a Universal Banker II.   As a female individual over 40, as well as having other protected characteristics, she is a member of various protected categories of individuals under pertinent civil rights statutes.

7.    Defendant, Bryn Mawr Trust Company ("Defendant" or the "Bank") is a wholly owned subsidiary of Bryn Mawr Bank Corp, a publicly-traded commercial bank, headquartered at 801 Lancaster Avenue in Bryn Mawr, Pennsylvania.  The Bank employed Plaintiff and approximately 600 employees and is an employer as defined by Title VII and the PHRA. At all pertinent times, Francis Leto has been the CEO and responsible for Defendant's practices.  While Defendant and its publicly-traded parent hold themselves out as a  "community" bank and a

dedicated and responsible neighbor, in fact, contrary to shareholders interests, the bank has been run as a patronage fiefdom of Mr. Leto, catering to and supporting friends and family, as well as supporting the interests of Leto-related business interests. While employees compete to win WAWA gift cards, Mr. Leto is paid approximately $1.7 million.

8       At all relevant times hereto, Defendant has acted by and through its duly authorized actual and/or apparent agents and employees, acting within the course and scope of their actual and/or apparent agency and employment.

## JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction over the subject matter of Plaintiff's claims under federal law pursuant to 28 U.S.C. §1331.

10.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367 because the state claims and federal claims are so interrelated that they form part of the same case or controversy under Article III of the United States Constitution.

11.      Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §1391(b) and (c) since Plaintiff and Defendants reside in the Eastern District of Pennsylvania, and since a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Pennsylvania.

## FULFILLMENT OF TITLE VII CONDITIONS

12.      Plaintiff has fulfilled all conditions precedent to the institution of this action under Title VII and PHRA.  Plaintiff dual-filed a charge of discrimination, No. 530-2019-03263 with the EEOC and the PHRA. Eventually the EEOC issued a Right to Sue letter to the Plaintiff dated October 28, 2019, which was subsequently received by Plaintiff.  Accordingly, this lawsuit has been brought within ninety (90) days of the issuance of the Right to Sue letters.

4

## FULFILLMENT OF WHISTLEBLOWER CONDITIONS

13.     As required by statute, and as set forth hereinbefore, Plaintiff has properly filed her whistleblower complaint with the Department of Labor, OSHA Division. Pursuant to applicable statutes, prior to being able to proceed to federal court, Plaintiff first had to file her complaint with OSHA, followed by the expiration of 180 days without a final decision by the Secretary of Labor.  As Plaintiff filed that complaint with OSHA on May 9, 2019 and has received nothing in the way of notification of a final decision, the requisite time has run such that Plaintiff can now file her claims in this Court.

## FACTUAL ASSERTIONS

14.     Plaintiff was hired in May, 1999 as a Financial Services Specialist, since she had passed the Series 6 and Series 63 tests, thereby having earned the requisite license to handle financial products in a securities firm context. In approximately 2007 she was transferred to Defendant's Havertown branch. In 2010, she was transferred to Defendant's Bryn Mawr branch where she worked until she was transferred back to Defendant's Havertown branch. At all times, Plaintiff changed locations at the request of bank managers who specifically recruited her based on her experience and demeanor.  Plaintiff's responsibilities were to assist current bank clients as well as to market bank services and products so as to increase the number of clients for the Bank. Plaintiff 's Series 6 and 63 credentials guided her approach to clients. The first and foremost commandment of those tests is: "Know Thy Client", meaning that offerings made to a specific client must be only those which are appropriate for her specific needs and situation. This commandment has proven to be a foreign concept to Defendant's executives and management which instead threaten employees' tenure unless quotas are met, imploring them to "create urgency" in selling product, regardless of actual client needs. Defendant has substituted for that

commandment endless sales contests and "push" memos to pump out product, in a manner which is juvenile and demeaning.

15.    As some point Plaintiff's title was changed to "Universal Banker II" which remained her title until she was fired. A current job posting ad imploring applicants to join Defendant's "LEGACY OF CREATING SUCCESS" sets forth a job description for a Universal Banker position with pertinent Responsibilities as follows:

*   Providing a complete range of customer services including but not limited to: opening new accounts, explaining available products and services, and gathering customer information to process new and existing accounts.

*   Assesses customer needs…

*   Referring existing clients to other lines of business,….

*   Receives deposits, loan payments, customer service requests and ensures that all accounts are properly processed.

*   Participates in all day-to-day operational activities; and

*   Acting in the teller position.

Interestingly, the position does not require the securities exams or licenses which Plaintiff possessed when she was hired. During Plaintiff's tenure. Management instead decided that Defendant did not want to support or require these licenses which would have made for informed employees and an informed clientele. Instead of having an educated and informed staff, bank management decided to replace licensure with contests, dangling the prospect of winning a WAWA card worth a few dollars in front of uninformed low-paid sales minions.

16.    Plaintiff earned consistently favorable reviews and other accolades. In 2017 she received a bonus of $1,600, an individual sales incentive of $1,250, and an all-important award

from a sales incentive contest of $75.00. In 2018, she received a bonus of $1,825, an individual sales incentive of $2,856.25 and an all-important award from a sales incentive contest of $20.00. This is in addition to those all-important WAWA gift cards as the prize for a branch or regional sales contest. On February 1, 2019 Plaintiff received a Certificate of Achievement in recognition of exemplary service and unparalleled performance for the 4th Quarter of 2018.

17.     In Plaintiff's experience, the "bucket shop" mentality described hereinbefore was not always the case. Until 2016, Plaintiff was proud of Defendant and generally enjoyed her employment, believing that Defendant was a company with integrity that was successful because of superior products and customer service. In turn, Plaintiff was known as an employee who was dedicated, hardworking, goal-oriented and honest. She felt confident in her work.

18.     BMT came to be interested in replacing Plaintiff and others like her with younger, more compliant, and less discerning personnel. For example, Plaintiff could see the change with respect to training programs which she came to dislike. By way of one example, trainer, Mary Venditi, constantly made derogatory age-related remarks. During an IRA training program, she became exasperated when asked about processing withdrawals. Her reaction was "I don't know what's wrong with you people. If the client is old, they get the money without a penalty". She then laughed at her own comment. Plaintiff subsequently pointed out that the age of a penalty-free withdrawal was 59 ½ and that, coincidentally, this was Plaintiff's age. There was nothing funny about the age denigrating comment as Plaintiff said that Ms. Venditi's comment was insulting. Ms. Venditi simply laughed. Plaintiff constantly received negative reactions in response to any comment or question that she made during training or telephone conferences. She felt that the reaction was age related. She announced at one point to other staff members of

the Havertown branch and managers that she was not going to make any further comments or questions as she was simply tired of the constant beat down.

19.     Bank attitude also changed for Plaintiff when she was injured with a severe leg injury in 2016. Human Resources representatives thwarted Plaintiff in her efforts to return to work. Part and parcel of their actions included giving false information as to her job responsibilities to her physician.  Consistent with this deceitful behavior, until the time of Plaintiff's termination, HR personnel were much less than candid with Plaintiff. For example, HR told her that documents returned by her physician were incomplete, at the same time refusing to identify to Plaintiff know what was missing. Plaintiff felt that Defendant was out of compliance with the Americans with Disabilities Act. At one point, Plaintiff emailed HR to verify that she could return to work. As HR did not respond, Plaintiff assumed that it was permissible for her to return. She subsequently entered her branch and was told that she had to leave. As a follow-up, she sent a final email in October, 2016 asking to return. To this day, HR never responded.  Eventually, Plaintiff told HR representative Nicola Fryer that Defendant was out of legal compliance regarding this matter.  Plaintiff now realizes that it was a mistake to criticize HR as she has had two separate regional managers warn her "Whatever you do, don't get human resources mad at you."

20.     Plaintiff believes that Defendant has baselessly attempted to fire from the time of her conversation with Ms. Fryer forward. For example, Plaintiff was wrongfully accused of going on the internet and making negative comments about HR.   Nevertheless, this allegation was brought to the attention of Plaintiff's immediate supervisor, Branch Manager Tara White. At another time, when Plaintiff found that her paystub showed a payment for short term disability insurance which had been denied, she sent an email to HR to address what she thought was an

error.  Instead of responding to Plaintiff, HR representative Fryer sent her response to Branch

Manager White stating that Plaintiff needed to be counseled with respect to core values. Ms.

Fryer thought that Plaintiff was not a "team player."  Moreover, Ms. Fryer perversely thought

that Plaintiff should receive a written warning for disclosing confidential information about her

own payroll account. As a result of Ms. Fryer's lack of response to Plaintiff's concern about the

payroll deduction, Plaintiff then had to raise this issue to the head of HR and the Community

Banking Manager. Fortunately, Ms. White refused to discipline Plaintiff given the fact that what

was at issue was Plaintiff's own payroll information, which everyone on the email chain already

had access to. Nevertheless, the improper deduction was never resolved. In January, 2017 HR

brought up a question about the validity of an incentive payment to another employee at the

Havertown branch. Plaintiff had nothing to do with this. Nonetheless, Ms. White had to meet

with Nicole Fryer and upon information and belief, Laura Biernacki. Notwithstanding an obvious

lack of involvement, Plaintiff had to come in on her day off and list every account that she had

opened, each client's name, account number, and date of opening. Everything that Plaintiff had

done was appropriate and fine. The joke at the branch became: "If someone is doing something

wrong, look at Patti. Maybe we can get her for the same thing!"

21.     After a vacation, Plaintiff returned to work on February 12, 2019 and started her

work day. That very day, Ms. Lindsay Saling, Group VP and Retail Strategy Team Leader asked

Plaintiff to meet with her in an upstairs conference room. Once again, Plaintiff was questioned

about accounts and informed by Samantha Kohl of Branch Administration that, as too many

accounts had been opened on the last day of a new business campaign, an investigation had been

started. Plaintiff asked how many branches were involved. In characteristic fashion, an answer

was refused based on amorphous claims of "privacy". Plaintiff asked who was aware of and

sanctioned this meeting. She was told that it was HR representative Ms. Fryer, Audit Department

member David Wong, SR VP and Retail Banking Steve Novak, and a representative from IT.

22.     Ironically having too many accounts opened on the last day of a campaign was

hardly something unexpected, but rather the goal of management's pressure campaign., with the

"investigator" being the manager of a campaign encouraging fraud.  Of course, Mr. Novak was

the very architect of a system that relentlessly pushes employees to originate and/or falsify new

business.  Ms. Saling was Novak's enforcer, imploring employees to "Create urgency", going so

far as to writing scripts for them to get new business in accordance with the daily contest for

some silly prize. It was all about numbers and not about a client's real banking needs.

Employees such as Plaintiff were tracked in minute detail.  It was made clear to Plaintiff and

similarly situated employees that failure to meet those quotas would result in one's firing. The

pressure was such that employees had to plead with, not only existing customers, but friends and

family to open accounts, take on unnecessary loans, or take on other bank products that were

either unnecessary or ill-suited for them. The ever-constant "push" memos put out by Novak and

Saling were of the same base nature used by marketeers for rust proofing, aluminum siding, or

water softeners instead of financial services which were supposed to be tailored to a client's

needs. Defendant clearly has emulated the impermissible tactics employed by Wells Fargo,

23.     Senior management's behavior can clearly be likened to that exhibited by Wells

Fargo which has earned $1 billion in fines by the Consumer Financial Protection Bureau and the

Office of the Comptroller of the Currency. Moreover, the Federal Reserve handed down

unprecedented regulatory punishment for what it called "widespread consumer abuses,"

including its creation of fake customer accounts. In addition, Wells Fargo was fined $575 million

by all 50 states and the District of Columbia for fake accounts, improper auto-loan and customer

mortgage charges, and account add-on products. In the words of the California Attorney General, "Instead of safeguarding its customers Wells Fargo exploited them, signing them up for products—from bank accounts to insurance—that they never wanted." The statement can be applied to Defendant as well. The latest regulatory decision has barred its former CEO from banking for life. Ms. Saling's motto of "Create urgency" and Mr. Novak's incessant press for sales have been responsible for clients signing up for products that they never wanted. Interestingly, after public reporting on lawsuits filed against Defendant, Mr. Novak retired from the Bank.

24.     In the above-referenced meeting, Plaintiff was initially questioned, by Ms. Saling, of all people, about three accounts that she had opened for her sister. Multiple accounts for the same customer might be entirely unnecessary, but numbers were something that Ms. Saling wanted.  Plaintiff showed her that what she had done in their opening was entirely appropriate.

25.     Plaintiff was then questioned about an account that she allowed Branch Manager Tara White to open for her and her husband. The account had already been open and active for approximately one month.  Plaintiff and her husband came up with creating this new account for the simple reason that Ms. White had told Plaintiff that she was terrified that she would be fired, if she did not make her new account quota. At the meeting, Bank management claimed that Plaintiff's husband's signature was not supplied by him. Plaintiff denied this. Interestingly, bank policy dictated that if there had truly been a problem with the account at its inception, it would be frozen on account of fraud. Instead, management allowed the account to have been opened, activated, and never flagged or frozen. Despite the accusation and purported concern over the account, from its creation, through to the time of Plaintiff's firing and afterwards, Bank

management allowed the account to remain open without restraint until such time as Plaintiff herself closed it, well after her firing.

26.    It is elemental that if in fact there was a problem with this husband and wife account, Defendant's representatives simply could have called Plaintiff's husband and asked for his reaffirmation, ratification and/or consent which would have been given. However, as Defendant simply wanted to fire Plaintiff, it never chose to do so

27.    At this meeting, where Plaintiff was harassed over an account with her husband, Plaintiff set forth her history of unfair treatment received from Human Resources. Her inquisitors denied any knowledge of that history. After this, Plaintiff walked downstairs prepared to leave and spoke with Branch Manager Tara White informing her that those present were trying to fire her. Both Plaintiff and Ms. White then walked back upstairs. Plaintiff asked her inquisitors to stop lying and instead explain what was happening. They refused. Plaintiff then informed those assembled that she had told Ms. White that they were trying to fire Plaintiff. In front of Plaintiff and Ms. White Ms. Saling denied that scenario and asserted that this was simply an investigation. Ms. Saling was now red faced and clearly uncomfortable as she denied the true motivation and pretext for her accusations.

28.    Within twenty-four hours, Plaintiff and Ms. White were fired by Steve Novak. Given his patronizing and outright disdain for Plaintiff, her twenty years of employment didn't qualify for an in-person meeting.  Instead, he fired her via telephone call, during which, despite her request, he refused to provide her with a copy of the report upon which her employment termination was supposedly predicated. Twenty years meant nothing. As stated hereinbefore, Plaintiff had a history of good reviews, received raises and accolades and had previously never been disciplined. This too meant nothing.

29.     Incredibly this horrible transgression was all about a husband's signature on a joint account, where infirmities, if any, could have been easily rectified. Upon information and belief, Defendant, did not and would not know the true signature of any one signatory of a husband and wife account when it comes to a plethora of husband and wife accounts.

30.     In fact, it had been Defendant's past practice to use a signature card as a pretext for firing an employee who was in the protected age category. What is more, Defendant has been trying to get rid of older employees as it has offered a buyout to willing employees. When it came to Plaintiff, she had to work only four more years until she would be eligible for retirement.

31.     Prior to Plaintiff's employment termination, when news of black teller Wandrea Russo's complaints of racial discrimination and harassment surfaced, Plaintiff empathized with her, feeling that she had experienced some of the self-same retaliation and playbook treatment by HR.  Plaintiff made it known that if asked, she would fully support Ms. Russo, having known her as a high-quality employee. It brought back to Plaintiff the claims that she was an employee who needed to be watched, that she was not a team player and should be counseled on core values. In fact. it was members of the senior management team who needed to be counseled, if not fired when it came to adherence to core values. Given the surveillance that Plaintiff was under, upon information and belief, Plaintiff was retaliated against as a result of standing up for Ms. Russo and for herself.

32.     On April 15, 2019, Plaintiff executed and submitted her EEOC Charge of that discrimination. She checked the applicable boxes for "sex", "retaliation" and "age" and then added that she was also fired "… as a result of my complaining about improper sales pressure tactics of management."

## ADDITIONAL FACTS AS TO WHISTLEBLOWER CLAIMS

33.     The allegations of paragraphs 1-32 are incorporated herein by reference.

34.     Defendant and its parent company take great care in setting forth standards of conduct that they consistently ignore. One instance involves the bank's "Code of Business Conduct." Its Introduction states as follows:

> The continued success of Bryn Mawr Bank Corporation, The Bryn Mawr Trust Company and their subsidiaries (collectively herein referred to as "Bryn Mawr") is directly related to the confidence and trust our customers and shareholders have in us. It is important that all directors, officers and employees conduct their business within a framework of high ethical standards to retain such confidence and trust. In particular, the Code promotes the following five (5) objectives:
>
> A.  Honesty and ethical conduct, including the ethical handling of actual or apparent conflicts of interest. ……..

Simply stated there has been nothing ethical about BMT's cross-marketing campaign.

35.     As stated hereinbefore, during the course of her employment Plaintiff has experienced a change in Defendant's approach to sales. Historically the consumer lending division was staffed by lending officers and a staff of support administrators in order to provide Plaintiff and others similarly situated with a level of expertise so that they could create a good fit when it came to tailoring product for a customer.  Like so many other areas subjected to CEO Leto's cost-cutting, except of course when it came to his own compensation, the lending department was decimated. As a result, product support was significantly lacking for Plaintiff and other similarly-situated employees.  Plaintiff found it necessary to complain to Branch Administration about poor training and lack of service.

36.     The tenure of Retail Bank head Steve Novak marked a relentless campaign orchestrated and carried out by him, Lindsay Saling and Market Area Manager Laura Biernacki. Simply stated the campaign consisted of a program of cross-selling bank products and services to

14

increase sales, regardless of whether that product was in a customer's interests. With incentives consisting of minimal awards such as WAWA store gift cards, it was every bit a campaign of fear based upon quotas, daily tracking of employee sales results, and threats against any sense of job security. At the same time, the campaign invited Wells Fargo-like fraud which was entirely foreseeable by upper management.

37.     As has previously been cited herein, in addition to filing an EEOC Charge, Plaintiff filed her whistleblower complaint against Defendant with the US Department of Labor-OSHA dated May 7, 2019. Her whistleblower claims are now ripe for litigation given the passing of 180 days without a final decision by the Secretary of Labor. Plaintiff described therein her working environment as consisting of fraud with respect to enticement of clients to sign up for new products. She regarded the environment and practices as similar to those used by Wells Fargo, which were found to be violative of the Consumer Financial Protection Act of 2010. In addition she stated that "Bryn Mawr Trust's working environment can only be characterized as being SOX non-compliant, given 'control' and 'governance inadequacies which allow for this environment of pressure and fear instilled by bank management and improper cross selling of bank product regardless of whether or not they are in a client's best interests, and in some instances regardless of whether or not the client has accepted the new product."

38.     The process of cross-selling begins by asking a client to fill out a form with respect to his or her needs. If a client refuses to fill out the form, employees are supposed to fill out the form themselves. Some employees were so terrified at the pressure that they filled out the form without the client actually participating. Plaintiff's superior, Ms. White specifically told Ms. Biernacki that she was not comfortable with the form as she felt that she was falsifying the client's needs. Ms. Biernacki's response was "I don't care how you get them filled, just do it."

39.     On a quarterly basis, sales goals were given to every staff member in Defendant's branch system. Despite a decrease in staff, sales goals were increased. For example, loan origination goals for Plaintiff were increased from $150,000 to $275,000 for the next quarter. Employees were strongly encouraged to open accounts for family members. The conversations were not," Do you think your mother wants to open an account?". They were "Why doesn't your mother have an account?". If a client had a checking account, "Why didn't they have a savings account?". Every contact with a customer was expected to trigger a sales push from the staff. A dividend check received would result in a push for a meeting with the asset management department. A loan payment was expected to trigger a conversation to open a new loan that would garnish a larger debt for the client. It didn't matter if the customer did not need it.

40.     Staff members not making their goals, were put on a plan to increase their sales with the understanding that keeping their position was dependent on strong sales. Market Area Manager Biernacki would come to a branch and ask an employee where he or she was in terms of his or her goal and what were they doing about it. On a daily basis, employees had to report and forward to management the accounts that were opened that day. During Ms. Biernacki's surprise visits, upon her demand, employees had to produce their completed new business forms. When employees complained about the forms, her comment was "Steve (Novak) wants them…. get them done." Verbal or written warnings were issued if they were not produced. Ms. Biernacki made all managers aware of their standing amongst their peers. Woe to that person who she labeled "the bottom of the barrel." In Plaintiff's words, Plaintiff and others were subject to "management by embarrassment." It was a bad day for the branch if a sale was not made. Employees were also required to complete financial needs review sheets on at least three customers daily with the goal of making additional sales. Every day the focus was on sales. The

message was clear, to work at BMT, you had to make the sales. Staff cuts were made and training was poor, but the quotas remained the same or were even hiked.

41.     On numerous occasions, Plaintiff told Branch Manager Tara White that the sales goals were too high and that the pressure was excessive. Reducing customer service staff by 25% and increasing sales goals were simply incompatible in Plaintiff's mind. Ms. White, in turn, told Market Area Manager Laura Biernacki and representatives of HR that the effect of continuously increasing sales goals, coupled, with the constant fear of termination, was creating a culture that encouraged opening accounts that were not needed or wanted by the customers. It was also sure to result in fraud.

42.     Staff came up with idea of redistributing the goals so as to reduce the sales burden on them. Instead of welcoming ideas to help the staff, Ms. Biernacki told Ms. White that if she redistributed or changed the goals, she would be given a written warning and could be terminated. Ms. White then spoke to Human Resources about these sales goals and Ms. Biernacki's threats. Ms. White also identified Plaintiff as one of the employees with concerns. Ms. White was told by HR that they understood and would look into it. True to form and wed to an improper status quo, HR never did so.

43.     In 2018, Bryn Mawr Trust decided it was losing money by not charging enough in terms of customer account fees. Prior to instituting the customer charges, all branch personnel were required to participate in telephone conference calls. The staff was told that no matter how they felt about these charges, they needed to put a positive spin on the increases. The staff was to make comments like, "after a review of other banks, we found these charges to be reasonable." During the conference, there was a review of the fees to be charged. Plaintiff was concerned about the "foreign atm" charge. Historically, BMT never charged a client to use a non-BMT atm

machine; i.e., a "foreign atm". When asked for comments, Plaintiff explained to the group on the call that included Steve Novak, Tina McDonald of Branch Administration, and the other branch staff members, that she thought the wording was confusing. She voiced concern that when customers were being told that they were going to be charged for a foreign atm, that they would believe "foreign" to mean "international", not simply a non BMT atm machine. Despite his specifically seeking feedback, Mr. Novak became enraged with Plaintiff and her comment, making an example of her by calling her out by name. The effect was chilling, making Plaintiff out to be an aged relic. It was all done deliberately to deter Plaintiff and others from so much as questioning his dictates. When the call ended, other staff members commented on the inappropriateness and harshness of his comments to Plaintiff,

44.     With regard to consumer lending, Defendant pushed home equity lines of credit ("HELOC"). During Plaintiff's tenure, Defendant had a program offering below prime rates for the life of the loan. Notwithstanding, after promising below prime rates, Plaintiff had customers who were not given the below market rate, but instead were charged interest over prime. Plaintiff complained to her supervisor Ms. White, the Market Area Manager, as well as the customer service staff that it was necessary to carefully review all lending decisions and to question the decisions that were being made. Plaintiff also believed that interest rates were higher than they needed to be. Upon information and belief, Plaintiff contends that there have been other instances where employee relatives were encouraged to take out needless lines of credit, coupled with the requirement that unnecessary new savings and checking accounts be opened.

45.     Management touted those with the best numbers, including some who clearly gamed the system, and others in some instances who committed outright fraud. This includes one individual personally promoted as a role model by Steve Novak. It was clear to others however

that this individual's branch could not possibly generate the numbers. Upon information and belief, that individual was fired.

46.     When other managers asked how to achieve their quotas, Defendant's management termed Newtown Square Branch as a favored example. When asked by other managers Mr. Novak would say "Call Newtown Square for tips as they have exceeded their credit card goals. Ask them what they are doing." Upon information and belief, what was transpiring at the very least was questionable. However, Mr. Novak and his minions didn't want to know what was really happening there or elsewhere. It was just about the numbers.

47.     Plaintiff knew that fraudulent misrepresentations had been made to clients. For example, Plaintiff learned from Branch Manager White about a client who came in to close his account, wondering why he had two accounts, both of which originated at another branch.  This is exactly the same type of occurrence for which Wells Fargo has been sanctioned.

48.     As mentioned hereinbefore, it became clear to Plaintiff that management and HR were determined to destroy Plaintiff's reputation and was looking to terminate her, due to their concern that Plaintiff would report their actions to the appropriate governing bodies. When Plaintiff first met Market Area Manager Biernacki, she told Plaintiff that she was aware that Plaintiff had issues with HR. After being told this, Plaintiff asked Ms. White for further information.  Ms. White confided in Plaintiff that an HR representative had told her and Ms. Biernacki to "watch her", that Plaintiff was not the person she seemed, and that Plaintiff was someone who could cause trouble. Further, Plaintiff and Ms. White believed that they were subject to surveillance by Defendant. Even after her firing, Plaintiff believes that other bank employees have been threatened with discipline and/or firing if they support Plaintiff's claims.

Comments about Plaintiff's departure or any contact with Plaintiff would be disciplines.  In the end HR and Defendant were successful. They destroyed Plaintiff's reputation and fired her.

49.    Plaintiff's case shows that when it comes to BMT and the Bryn Mawr Bank Corporation, the wrong team flourishes acting contrary to core values as well as to statutory requirements.

**COUNTS**

**<u>COUNT I</u>**

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED,
42 U.S.C. § 2000e *et seq*
SEX DISCRIMINATION, MAINTENANCE OF A HOSTILE WORK ENVIRONMENT
and RETALIATION**

**Patti R. Real-Loomis vs. Bryn Mawr Trust Company**

50.    Plaintiff restates and realleges paragraphs 1 through 49 as though set forth here in full.

51.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, *et seq.* as amended by the Civil Rights Act of 1991 ("Title VII), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

52.    Discrimination on the basis of sex that creates an abusive and hostile work environment, such that the conditions of employment are altered, is actionable under Title VII as sex discrimination. In order to establish a hostile work environment, five factual elements must be established: (1) that the employee suffered intentional discrimination because of his or her protected characteristic; (2) that the discrimination detrimentally affected him or her; (3) that the discrimination was pervasive and regular; (4) that the discrimination would detrimentally affect a reasonable person in the same position as the employee; and (5) that respondeat superior liability

20

exists. In the totality of circumstances described in the Facts set forth hereinbefore, the foregoing five elements are established.

53.    Defendant BMT is responsible for retaliating against Plaintiff as a result of her complaints of discriminatory treatment and a hostile work environment.

54 .    Defendant BMT is liable for discrimination alleged herein under the doctrine of *respondeat superior* due to the actions and statements of its managers and employees.

55.    Defendant BMT is liable for the acts of management and Plaintiff's co-workers, because it knew of their proclivities permitting discrimination and a hostile work environment to exist, but did nothing about it.

56.    Defendant BMT is liable for the acts alleged herein because its board, owners and managers established the corporate culture which encouraged sex discrimination, harassment and retaliation.

57.    Based upon the foregoing facts, Defendant BMT has discriminated against Plaintiff on the basis of her sex, retaliated against her for standing up for herself and other females and has deprived her of her rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et. seq. as amended.*

58.    Defendant BMT's conduct has been disparate, intentional, deliberate, willful and conducted in callous disregard of the rights of the Plaintiff.

59.    Defendant BMT's policies and/or practices have produced a disparate impact against the named Plaintiff with respect to the terms and conditions of employment.

60.    By reason of Defendant BMT's discrimination, Plaintiff is entitled to all legal and equitable remedies available.

## COUNT II

### AGE DISCRIMINATION IN EMPLOYMENT, CREATING A HOSTILE WORK ENVIRONMENT AND RETALIATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967

**Patti R. Real-Loomis vs. Bryn Mawr Trust Company**

61. Plaintiff restates and realleges paragraphs 1 through 60 as though set forth here in full.

62. The Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, *et seq.* as amended ("ADEA"), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of age. At all times complained of herein, Plaintiff was an employee in the protected age category, of at least 40 years of age pursuant to 29 U.S.C. §631.

63. The ADEA at Section 623 (a) provides that it is unlawful for an employer "(1)…to discharge or otherwise discriminate against any individual with respect to his compensation, terms conditions, or privileges of employment because of such individual's age; (2) to limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age;" Further, Section 623(d) makes it illegal for an employer to discriminate against an employee for his or her opposition to unlawful practices.

64. Defendant BMT is liable for discrimination alleged herein under the doctrine of *respondeat superior* due to the hostile work environment created by the actions and statements of its managers, employees and owners.

65.     Defendant BMT is liable for the acts of its Board, its management, and co-workers, because it knew of their proclivities when it came to age discrimination towards Plaintiff and permitted a hostile work environment to exist, but did nothing about it.

66.     The age discrimination detrimentally affected Plaintiff and made her suffer emotional distress. Upon information and belief, Plaintiff has been replaced by a younger, less qualified employee. as well as emotional attendant to losing her job.

67.     Defendant BMT is liable for the acts alleged herein because its Board and managers established the corporate culture, which encouraged age discrimination, harassment and retaliation, as well as other forms of discrimination.

68.     Based upon the foregoing facts, Defendant BMT has discriminated against Plaintiff on the basis of her age, retaliated against her for standing up for herself, and has deprived her of her rights in violation of The Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, *et seq*.

69.     As a result of such conduct by Defendant BMT, Plaintiff has suffered damages and is entitled to back pay, front pay, and compensatory damages for, among other things, emotional trauma and the physical consequences thereof suffered by her as a consequence of Defendant's illegal conduct.

70.     The described unlawful employment practices by Defendant BMT were intentional and were done with malice or reckless indifference to Plaintiff's rights protected by the laws of the United States, as well as the laws of the Commonwealth of Pennsylvania.  These unlawful acts were committed because of her age and were in retaliation against her standing up for herself, in opposition to illegal practices directed against her.

71.     The effect of the aforementioned practices has been to deprive Plaintiff of equal employment opportunities and adversely affect her status as an employee because of her age.

72.     By reason of Defendant BMT's discrimination, the named Plaintiff is entitled to all legal and equitable remedies available.

## COUNT III

### VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT

### SEX and AGE DISCRIMINATION IN EMPLOYMENT, CREATING A HOSTILE WORK ENVIRONMENT AND RETALIATION

### Patti R. Real-Loomis vs. Bryn Mawr Trust Company

73.     Plaintiff realleges paragraphs 1 to 72 and incorporates them by reference as though set forth here in full.

74.     This claim arises under the Pennsylvania Human Relations Act ("PHRA"). The Pennsylvania Human Relations Act, 43 P.S. § 955 *et seq.*, makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment.

75.     Plaintiff is in a protected class because of her sex and age.

76.     Based upon the foregoing facts, Defendant BMT has discriminated against Plaintiff on the basis of her sex and age and has deprived her of her rights in violation of the Pennsylvania Human Relations Act, 43 P.S. § 955 *et. seq.*

77.     As a result of such conduct by Defendant BMT, Plaintiff has suffered damages and is entitled to back pay, front pay, and compensatory damages for, among other things the consequences thereof suffered by Plaintiff as a consequence of Defendant BMT's illegal conduct.

## COUNT IV

## RETALIATION IN VIOLATION OF 18 U.S.C. SECTION 1514A -THE SARBANES-OXLEY ACT

### Patti R. Real-Loomis vs. Bryn Mawr Trust Company

78.     Plaintiff realleges paragraphs 1 to 77 and incorporates them by reference as though set forth here in full.

79.     Based upon this Complaint, Plaintiff was discriminated against, threatened, harassed, and ultimately fired because she wanted to act lawfully, protest, report and cause an investigation into what she reasonably believed to be improper or illegal activity contrary to Title VII of the Sarbanes Oxley Act of 2002.

80.     Section 1514A of SOX is found at Title 18 CRIMES AND CRIMINAL PROCEDURE, Part I. CRIMES, Chapter 73 OBSTRUCTION OF JUSTICE. It provides Plaintiff and others similarly situated with a "Civil action to protect against retaliation in fraud cases" It provides in pertinent part:

(a) Whistleblower protection for employees of publicly traded companies. No company with a class of securities registered under section 12 of the Securities Exchange Act of 1923 (citation omitted), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (citation omitted), including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company….may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee –

(1) to provide information, cause information to be provided or otherwise assist in an investigation regarding any conduct which the employee reasonably constitutes a violation of section 1341, 1343,1344, or 1348 [citation omitted] , any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by-

(A) a Federal regulatory or law enforcement agency;
(B) any Member of Congress or any committee of Congress; or
(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover or terminate misconduct); or …

81..   Defendant BMT is a wholly owned subsidiary of Bryn Mawr Bank Corporation, a company required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. Section 780 (d) within the meaning of 18 U.S.C. Section 1514A. As such Defendant BMT is properly named as a defendant for SOX civil action purposes.

82.   Plaintiff complained to her superiors and provided information to Human Resources and others with supervisory authority over her who had authority and responsibility to investigate, discover, or terminate misconduct. Instead, Plaintiff was harassed and ultimately terminated from employment.

83.   Plaintiff's communications and information provided to Defendant's managers, representatives of HR, and others regarded conduct which Plaintiff reasonably believed constituted rules or regulations of the Securities and Exchange Commission and/or provisions of Federal law relating to fraud against shareholders.

84.   Defendant BMT's managers, HR members, and other department managers each had supervisory authority over Plaintiff and/or had authority to investigate, discover, or terminate misconduct.

85.   In providing this information to Defendant BMT's managers, Plaintiff engaged in protected conduct.

86.   The Complaint filed by Plaintiff with the Department of Labor-OSHA related to an alleged violation of rules or regulations of the Securities and Exchange Commission and/or provisions of Federal law relating to fraud against shareholders.

87.     Defendant BMT's managers and HR personnel responsible for the discriminatory actions and/or harassing conduct were aware of Plaintiff's protected conduct.

88.     Plaintiff's protected conduct constituted contributing factors in Defendant BMT's discrimination and harassment of Plaintiff.

89.     Defendant BMT, through its managers and HR personnel, engaged in discrimination, harassments and discharge of Plaintiff because of and in retaliation for her lawful and protected acts of providing the information and complaints described herein to managers and HR personnel.

90.     As a result, Plaintiff is entitled to all relief pursuant to SOX which includes the recovery of back pay, front pay, compensatory damages for emotional distress and attorneys' fees.

## COUNT V

### RETALIATION IN VIOLATION OF THE CONSUMER FINANCIAL PROTECTION ACT OF 2010

### Patti R. Real-Loomis vs. Bryn Mawr Trust Company

91.     Plaintiff realleges paragraphs 1 to 90 and incorporates them by reference as though set forth here in full.

92.     The Consumer Financial Protection Act of 2010 was enacted to overhaul regulation specifically of the financial sector after the last banking debacle. The Act established a new Consumer Financial Protection Agency to regulate financial products which include home mortgages, car loans and credit cards. Purposes of the act include: promoting financial stability by improving accountability and transparency in the financial system, protecting the US taxpayer

by ending bailouts, and specifically protecting consumers from abusive financial services practices.

93.      The definition of consumer fraud includes acts resulting in financial or other losses for consumers in business transactions or where any person utilizes any unfair commercial practice, deception, fraud, false promise, suppression, or omission of any material fact with an intention to sell or advertisement of any product by misleading the consumer. Further, 12 U.S. Code Section 5531 prohibits unfair, deceptive, or abusive acts or practices involving any transaction with a consumer for a consumer financial product or service.  Similarly, 12 U.S. Code Section 5536 sets forth "Prohibited acts."

94.      In terms of employee protection the Consumer Financial Protection Act provides at Section 1057 for "EMPLOYEE PROTECTION" stating that " No covered person or service provider shall terminate or in any other way discriminate against, or cause to be terminated or discriminated against….by reason of the fact that such employee…, whether at the initiative of the employee or in the ordinary course of duties of the employee has- (1) provided, caused to be provided, or is about to provide or cause to be provided information to the employer, the Bureau, or any other State, local, of Federal, government authority or law enforcement agency relating to any violation of, or any act or omission that the employee reasonably believes to be a violation of, or any act or omission that the employee reasonably believes to be a violation of this title or any other provision of law that is subject to the jurisdiction of the Bureau."

95.      Defendant BMT offers financial products and services which brings it within the ambit of the Consumer Financial Protection Act.

96.      Plaintiff complained to her superiors and provided information to Human Resources and others with supervisory authority over her who had authority and responsibility to

investigate, discover, or terminate misconduct. Instead, Plaintiff was harassed and ultimately terminated from employment.

97.    Plaintiff's communications and information provided to Defendant's managers, representatives of HR, and others regarded conduct which Plaintiff reasonably believed constituted rules or regulations of the Securities and Exchange Commission and/or provisions of Federal law relating to fraud against shareholders.

98.    Defendant BMT's managers, HR members, and other department managers each had supervisory authority over Plaintiff and/or had authority to investigate, discover, or terminate misconduct.

99.    In providing this information to Defendant BMT's managers, Plaintiff engaged in protected conduct.

100.    The Complaint filed by Plaintiff with the Department of Labor-OSHA related to an alleged violation of rules or regulations of the Securities and Exchange Commission and/or provisions of Federal law relating to fraud against shareholders as well as with respect to the rules and regulations under the Consumer Financial Protection Act of 2010.

101.    Defendant BMT's managers and HR personnel responsible for the discriminatory actions and/or harassing conduct were aware of Plaintiff's protected conduct.

102.    Plaintiff's protected conduct constituted contributing factors in Defendant BMT's discrimination and harassment of Plaintiff.

103.    Defendant BMT, through its managers and HR personnel, engaged in discrimination, harassments and discharge of Plaintiff because of and in retaliation for her lawful and protected acts of providing the information and complaints described herein to managers and HR personnel.

104.   As a result, Plaintiff is entitled to all relief pursuant to the Consumer Financial Protection Act of 2010.

## RELIEF REQUESTED

This civil action seeks on behalf of Plaintiff, legal and equitable relief including:

a.   A declaratory judgment declaring that Defendant BMT has illegally discriminated against Plaintiff under Title VII of the 1964 Civil Rights Act, as amended 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act of 1967, 29 U.S.C. Sections 621 *et seq.*, and the Pennsylvania Human Relations Act.

b.   An appropriate remedial order, granting injunctive relief, directing and requiring the following:

i.   Appointment of a civil rights monitor or trustee over Defendant' BMT's operations, fully empowered to implement any injunctive relief issued by this Court, to oversee any and all employment practices until such time as Defendant BMT no longer discriminates against its employees.

ii.   An immediate ban on any use of any discriminatory activities of the type described hereinbefore.

iii.   Such other remedial action as is needed to enforce compliance with all relevant standards of non-discrimination on the basis of race or color.

v.   Reinstatement of seniority and benefits with back and front pay for Plaintiff. and payment of compensatory and punitive damages, together with attorney's fees and the costs of suit, to Plaintiff in excess of $150,000, in an amount to be determined at trial for each of her Federal and State civil rights counts set forth hereinbefore.

vi.  All relief pursuant to SOX which includes the recovery of back pay, front pay, compensatory damages for emotional distress and attorneys' fees.

vii. All relief pursuant to the Consumer Financial Protection Act.

viii. Such other and further relief as the Court may deem just and proper.

ix.   Retention of jurisdiction by this Court until such time as the Court is satisfied that Defendant BMT has remedied the practices complained of herein and are determined to be in full compliance with the law.

## JURY DEMAND

The Plaintiff demands trial by jury of all issues triable of right to a jury.

## CERTIFICATION

I hereby certify that this Plaintiff has not brought a similar or related lawsuit encompassing the claims brought in this matter.

Date: January 27, 2020

Respectfully Submitted

/s/ Mark D. Schwartz
Mark D. Schwartz, Esquire
P.O. Box 330
Bryn Mawr, PA  19010-0330
Telephone & Fax: 610 525-5534
Email: MarkSchwartz6814@gmail.com
Pa. I.D. #30527

Attorney for Plaintiff, Patricia R.  Real-Loomis

## **VERIFICATION**

I, Patricia Real-Loomis, do hereby certify that I am the Plaintiff in the within action, and that the facts contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I do further understand that these statements are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsifications to authorities.

Patricia Real-Loomis

Dated: 1/27/2020