IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PATRICIA REAL-LOOMIS,**<br><br>*Plaintiff,*<br><br>v.<br><br>**THE BRYN MAWR TRUST COMPANY**,<br><br>*Defendant.* | **Case No. 2:20-cv-0441-JDW** |

## MEMORANDUM

Certain things, it would seem, should be obvious enough to go without saying. If you make a complaint, but your employer doesn't know about it, then the employer can't decide to fire you because of the complaint. If you make a complaint after you were fired, then the employer can't have fired you based on the complaint. And, if you work for a bank and falsify a signature, the bank can fire you, even if you have a benign explanation for what you did. These principles should go without saying, but the Court has to say them because Patricia Real-Loomis disputes them in her lawsuit against her former employer Bryn Mawr Trust Company ("BMT"). Undisputed facts demonstrate each of these principles in this case, and each of them means that Ms. Real-Loomis cannot prevail on her remaining claims. The Court will therefore grant BMT's summary judgment motion.

I.  **BACKGROUND**

   A.  **Ms. Real-Loomis's Employment At BMT**

Ms. Real-Loomis worked as a Universal Banker II at BMT's branch in Havertown, Pennsylvania. BMT subjected its employees to "relentless" and "incessant" sales pressure. (ECF No. 49-3 at 334:11, 337:11.) Senior Management imposed sales quotas and tracked how much new business employees generated. Employees feared that BMT would terminate them if they did not meet their sales goals.

In October and December of 2018, and then again in January of 2019, Ms. Real-Loomis complained to her supervisor and branch manager, Tara White, about the sales pressure at BMT. She told Ms. White that BMT's sales tactics were "inappropriate, fraudulent, and not at all in the best interests of customers." (ECF No. 49-2 at ¶ 8.) For example, she believed that because of BMT's sales requirements, bank employees would pressure customers to open accounts that they did not need. Ms. White shared Ms. Real-Loomis's concerns with Laura Biernacki, the regional manager.

At some point, Ms. White became afraid that she could lose her job by not fulfilling her sales quota, so she asked Ms. Real-Loomis to help her by opening a bank account. Ms. Real-Loomis agreed to do so. On December 31, 2018, Ms. Real-Loomis opened a joint account with her husband. Her husband was not in the branch when she opened the account, so she claims that she took a signature card home with her so that he could sign

it. She says she returned the signed signature card to Ms. White the next day, but no one can find it.

BMT's Group Vice President and Retail Strategy Team Lead, Lindsay Saling, noticed that there had been "an unusually large number of new account openings" at the Havertown branch on December 31, 2018, the same day Ms. Real-Loomis opened an account as a favor to Ms. White. (ECF No. 47-25 at ¶ 7.) In addition, she noticed that a large number of the account openings were for relatives of BMT employees. Ms. Saling determined that these account openings were suspicious, so she began investigating them. On February 11 and 12 of 2019, Ms. Saling interviewed seven BMT employees who worked at the Havertown branch on December 31, 2018, including Ms. Real-Loomis. During the interview, Ms. Real-Loomis denied forging her husband's signature in order to open the joint account. Instead, she told Ms. Saling that her husband signed the signature card at home and that she gave the signed card to Ms. White. Neither Ms. Real-Loomis nor Ms. White could produce the signed card. Following the interviews and her investigation, Ms. Saling reached the conclusion that Ms. Real-Loomis had forged her husband's signature on an electronic signature pad in order to open the account with Ms. White. In her role at BMT, Ms. Saling was responsible for decisions regarding the hiring and firing of employees. Having determined that Ms. Real-Loomis forged her husband's signature, Ms. Saling decided to fire her. The fact that Ms. Real-Loomis could not produce a signed signatured card "factored heavily" into Ms. Saling's decision. (*Id.* at ¶ 14.)

On February 13, 2019, BMT terminated Ms. Real-Loomis's employment. In addition, Ms. Saling decided to fire Ms. White for her involvement in the fraudulent account openings, and another employee, Cristin Harte, who forged her sister's signature to open an account. Ms. Saling also took lesser disciplinary actions against four other BMT employees who violated various bank policies.

In May 2019, Ms. Real-Loomis filed a whistleblower complaint with the U.S. Department of Labor, alleging that BMT had committed violations of the Sarbanes-Oxley Act ("SOX") and the Consumer Financial Protection Act of 2010 ("CFPA").

**B.     Procedural History**

On January 27, 2020, Ms. Real-Loomis filed a lawsuit against BMT, asserting claims of sex and age discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and the Pennsylvania Human Relations Act, as well as claims of retaliation in violation of SOX and the CFPA. The Court dismissed all of Ms. Real-Loomis's sex and age discrimination claims for failure to state a claim. During discovery, Ms. Real-Loomis identified six BMT practices that she contends violate SOX and the CFPA: (1) telling customers that some checking accounts came with a free savings account when that was not the case; (2) falsely telling customers that a new account came with a call from an insurance agent for a free quote; (3) improper disclosures concerning promotional rates for loans; (4) making multiple calls about paperwork to customers who had applied for loans; (5) having tellers

take credit card applications; and (6) applying sales pressure to employees, which she speculated might have led to fraud. On September 26, 2022, BMT moved for summary judgment on each of the remaining retaliation claims under SOX and the CFPA. That motion is ripe for the Court's disposition.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B).

## III. DISCUSSION

To withstand BMT's motion for summary judgment, Ms. Real-Loomis must identify evidence in the record from which a jury could determine that: (1) she engaged in a protected activity; (2) BMT knew or suspected that she engaged in the protected activity; (3) she suffered an adverse action; and (4) the protected activity was a contributing factor to the adverse action. The Third Circuit has held that those are the elements of a *prima facie* claim under SOX. *See Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 329 (3d Cir. 2016). And although the Third Circuit has not set forth the elements of a *prima facie* case of retaliation under the CFPA, other courts have held that they are the same as under SOX. *See, e.g., Veard v. F&M Bank*, 704 F. App'x 469, 473 n.4 (6th Cir. 2017). The Court agrees and will apply those elements to both claims. Ms. Real-Loomis's claims fail at several of the elements of a *prima facie* case. If Ms. Real-Loomis satisfies her burden to come forward with sufficient evidence to create a genuine dispute as to all four elements, then the burden shifts to BMT to demonstrate "by clear and convincing evidence that [it] would have taken the same [adverse] action in the absence of [any protected activity]." *Wiest*, 812 F.3d at 329 (quotation omitted).

### A. Ms. Real-Loomis Has Not Shown A *Prima Facie* Case

Ms. Real-Loomis cannot demonstrate at least two of the elements of a *prima facie* case: (1) protected activity; and (2) that any protected activity was a contributing factor in BMT's decision to terminate her.

6

### 1. Protected activity

Ms. Real-Loomis claims two different categories of protected activity: (1) her complaints to Ms. White about the sales environment at BMT; and (2) her complaint to the Department of Labor. There's little question that her complaint to the Department of Labor constitutes protected activity, and BMT does not argue otherwise. But her complaints to Ms. White do not constitute protected activity. Ms. Real-Loomis objected to the sales pressure that BMT imposed on employees and contended that it led to fraudulent activity, but there is no evidence that she complained to Ms. White about any of the specific conduct that she now claims violates federal law. A general complaint about her work environment and a generic reference to "fraudulent" activity does not constitute protected conduct under SOX or the CFPA. Ms. Real-Loomis would have had to identify specific practices that she thought were violations. She did not, so she didn't engage in protected conduct.

### 2. Contributing factor

Ms. Real-Loomis cannot establish that either alleged instance of protected activity was a contributing factor to BMT's decision to fire her. In retaliation cases like this one, plaintiffs cannot prevail on the causation prong where they cannot establish that the decisionmaker knew that they engaged in protected activity. *See, e.g.*, *Wiest*, 812 F.3d at 332; *Moore v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006); *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002).

Even if Ms. Real-Loomis's complaints to Ms. White constituted protected activity, there's no evidence that Ms. White or anyone else relayed them to Ms. Saling. Ms. Saling declared that when she made the decision to fire Ms. Real-Loomis, she "did not know whether she had made any complaints about violations of the Sarbanes Oxley Act or the Consumer Financial Protection Act." (ECF No. 47-25 at ¶ 26.) Ms. Real-Loomis has not pointed to any evidence in the record to rebut that fact. And, if Ms. Saling didn't know about those complaints, then she couldn't have factored them into her decision to terminate Ms. Real-Loomis. *See, e.g.*, *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014) (a lower-level supervisor's knowledge was not sufficient where the "discharge decision-makers had no knowledge—actual or constructive—of [the plaintiff's] protected activity"). Separately, Ms. Real-Loomis didn't complain to the Department of Labor until May 2019, so that complaint could not have played a role in BMT's termination decision in February 2019.

**B.     BMT Would Have Fired Ms. Real-Loomis Anyway**

BMT has presented undisputed evidence that it investigated seven employees based on the suspicious number of account openings on December 31, 2018. BMT disciplined those who it found to have opened fraudulent accounts or otherwise violated BMT's internal policies. In addition to terminating Ms. Real-Loomis, BMT fired two other employees as a result of its investigation: Ms. Harte, who also forged a family member's signature, and Ms. White, who orchestrated the whole scheme. BMT's treatment of

similarly-situated employees who did not complain about violations of SOX and the CFPA constitutes clear and convincing evidence that BMT would have fired Ms. Real-Loomis absent any protected activity. *See, e.g.*, *Johnson v. Stein Mart, Inc.*, 440 F. App'x 795, 802 (11th Cir. 2011) (considering whether other "non-SOX-reporting" employees were treated more favorably).

That outcome should come as no surprise. Financial institutions have to take forgery very seriously, even if there might be a somewhat-benign explanation. There's nothing wrong with BMT or any financial institution having a zero-tolerance policy for such conduct, and it's not the Court's job to second guess BMT's policies because the Court is not "a super-personnel department that reexamines an entity's business decisions. … Rather, [its] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (quotation omitted). Ms. Real-Loomis's contention that BMT could have, or should have, contacted her husband as part of its investigation into the account opening is not evidence of pretext; it's just a critique of BMT's methods. But the Court is not concerned with how BMT conducts its internal investigations or if BMT was correct that Ms. Real-Loomis forged her husband's signature. Because BMT has established that it would have made the same decision to terminate Ms. Real-Loomis regardless of any protected activity, it is entitled to summary judgment for this reason as well.

## IV. CONCLUSION

Ms. Real-Loomis cannot prove that her alleged complaints of SOX and CFPA violations contributed to BMT's decision to fire her. Even if she could establish that fact, BMT has demonstrated that it would have fired her anyway, so the Court will grant BMT's motion for summary judgment. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

**Date**: December 6, 2022